IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 11-4016-CR-C-MJW |
| | ) | |
| | ) | |
| TERRENCE LAMAR HAWKINS, | ) | |
| | ) | |
| Defendant. | ) | |

## REPORT AND RECOMMENDATION

On November 19, 2013, defendant Terrence Lamar Hawkins filed a motion to suppress evidence. (Doc. 78). The Government filed suggestions in opposition on December 6, 2013. (Doc. 81). A hearing was held on the motion on January 24, 2014.

### Discussion

Defendant's motion to suppress seeks to suppress all physical evidence seized from him at the Lincoln University Student Center on two occasions. Specifically, a loaded Hi-Point, Model JCP, .40 caliber, semi-automatic pistol seized on February 24, 2011, and a loaded Hi-Point, Model C-9, 9mm semi-automatic pistol seized on March 24, 2011. Defendant claims that the Lincoln University police officers improperly detained and searched him on February 24, 2011, and had no cause to arrest him on March 24, 2011.

### Facts

On February 24, 2011, Lincoln University Police Department (hereinafter "LUPD") Chief Bill Nelson, Lt. Greg McKinney, Cpl. Kevin Pigford and Officer Damon Nunn were all eating lunch together in the Lincoln University Scruggs Student Center cafeteria, when they observed a man sitting alone at a table who appeared to be intoxicated or under the influence of alcohol or narcotics. Neither Chief Nelson nor any of the officers recognized the man as a student or employee of Lincoln University (hereinafter "LU") and questioned whether he was a legitimate student or visitor to the LU campus. The Chief and officers testified that the Defendant looked out of place. Chief Nelson and Officer Nunn decided to approach the

Defendant.[1]  Chief Nelson asked the Defendant if he was a student and asked for his identification.   While seated, Defendant engaged in a conversation with the Chief.  Chief Nelson noticed the defendant was unkempt, had slurred speech, red eyes and had an odor of alcohol.

Defendant produced a Missouri non-driver identification card.  While he was producing his ID card from his wallet a large amount of cash was observed.  The Chief asked Defendant if he was a student.  Defendant responded with slow, slurred, speech that he had been a student off and on at the University.  The Chief then asked Officer Nunn to make a records check with dispatch.  Because of connection problems with dispatch using the police radio, the Officer used his cell phone to call dispatch to make the records check.  While the records check was being done, the other officers remained with Chief Nelson as he talked with Defendant (Defendant can be seen on the video showing Chief Nelson his arm to indicate where he had been shot before). A few minutes later (approximately five minutes per the videotape, Gov't. Exh. #4), dispatch confirmed that Defendant was not a student at LU and that he had a criminal history and was known to be armed.  Lt. McKinney then rejoined Chief Nelson and advised of the information. At this point, Defendant stood up and attempted to leave, and was instructed by the Chief and Cpl. Pigford to remain seated.  The Defendant complied and remained seated.  Based on the information provided by dispatch, Lt. McKinney made a telephone call to the Missouri Department of Probation and Parole who advised Defendant was under supervision with them and had a prior felony conviction for unlawful use of a weapon.

Officer Nunn and Cpl. Pigford observed a bulge in Defendant's left front pants pocket that they were concerned was a weapon.  Officer Nunn advised the Chief of his concern regarding the bulge.  Chief Nelson then asked Defendant what was in his pocket.  Defendant responded stating something to the effect that it was his money.  The Chief responded to Defendant that he knew it was not Defendant's money because he had seen Defendant's money in his wallet, when he had removed the wallet from his pocket to show the officers his identification card.  The Chief told the Defendant that they were going to search his pockets. Defendant objected and proceeded to attempt to run away, but was taken down by the officers while he was attempting to flee.  Cpl. Pigford felt the bulge they had observed in the pocket area of Defendant's pants and felt what appeared to be a gun in Defendant's pants. The officer put his

---

[1] Gov't. Exh. #4 is video of the February 24, 2011 incident at issue.  A video could not be located for the second March 24, 2011 incident.

hand into Defendant's pocket and pulled out a loaded .40 caliber handgun.[2]  The police also found marijuana in Defendant's pocket.  Defendant was thereafter put in handcuffs and placed under arrest.

After being placed under arrest, Defendant was transported to the Cole County Jail and Officer McKinney orally warned Defendant that he could not trespass on the grounds of Lincoln University in the future.

On March 24, 2011, a month and a day after the first incident, the LUPD received a phone call from employees in the cafeteria at LU reporting that the Defendant had returned. LUPD responded to the scene and took Defendant into custody for trespassing.  The officers then patted down the Defendant and discovered another weapon on his person.  Defendant was again arrested and taken to the Cole County Jail.  After this occurrence, LUPD sought a permanent no trespass order.  LUPD sent a letter to LU's President, referencing the previous verbal no trespass warning given on February 24, 2011, and sought a permanent written no trespass order to be issued by LU.

**February 24, 2011 Incident**

Defendant argues two bases for suppression as to the first February 24, 2011 incident. First, Defendant argues that he was unlawfully detained by the LU Police Chief and his officers in violation of his Fourth Amendment rights.  Defendant argues that the officers did not have reasonable suspicion to detain him beyond the point where the officers determined that he was not a student.  Second, Defendant argues that the search of his pockets did not fall within an exception to the warrant requirement, and therefore, his Fourth Amendment rights were also violated by the search.

The Government argues that pursuant to LU Rules and Regulations, Chief Nelson and his officers are responsible for the overall security of the campus community which includes the safety and welfare of all student, and employees of, and visitors to, LU.  Accordingly, Chief Nelson and his officers were within their authority to approach the Defendant on February 24, 2011, while he was seated alone at table in the Scruggs Student Center cafeteria based on

---

[2] The firearm that Defendant possessed had been previously owned by Officer Pigford.  It had been stolen from Officer Pigford.  Pigford had left the firearm with a girlfriend in Jefferson City, Missouri, when he was deployed to Desert Storm.  Upon his return the girlfriend was gone from Jefferson City and so was his firearm.  The Government did not present any evidence suggesting that Defendant may have been responsible for a possible theft of the firearm.

3

concerns that he appeared to be under the influence and out of place in the student center cafeteria. The Government argues that the Chief's conversation with the Defendant to determine whether he was intoxicated or under the influence, and whether he had a legitimate academic or visitation purpose on the LU campus were all part of a consensual encounter. The Government argues that it was during this consensual encounter that the Chief and officers gathered information which provided a basis for their reasonable suspicion justifying the extension of their encounter with Defendant. The Government further argues that the cumulative information and observations the Chief and officers obtained and viewed during the duration of the encounter provided a basis to detain the Defendant and conduct a pat down search of his person and subsequent removal of the loaded firearm from his pants pocket.

There are three categories of law enforcement encounters. There are consensual encounters, Terry stops, and custodial arrests. United States v. Johnson, 326 F.3d 1018, 1021 (8th Cir. 2003). Not all encounters between law enforcement and citizens implicate the Fourth Amendment. The Fourth Amendment only prohibits unreasonable "seizures." A seizure occurs "if, in view of all the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." I.N.S. v. Delgado, 466 U.S. 210, 215 (1984). Under this standard, a seizure does not occur simply because a police officer approaches an individual and asks a few questions or requests permission to search an area, even if the officer has no reason to suspect the individual is involved in criminal activity, so long as the officer does not indicate that compliance with his request is required. Florida v. Bostick, 501 U.S. 429, 434-435 (1991). "Only when the officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen may we conclude that a 'seizure' has occurred." Id. A "consensual" encounter between law enforcement and a citizen triggers no Fourth Amendment scrutiny. Bostick, 501 U.S. at 434. Whether an encounter is "consensual" is simply the inverse of the objective standard for existence of a seizure: "So long as a reasonable person would feel free to disregard the police and go about his business, the encounter is consensual, and no reasonable suspicion is required." Id. See also Michigan v. Chesternut, 486 U.S. 567, 574 (1998) (The test for whether a person has been "seized" within the meaning of the Fourth Amendment is an "objective standard" that looks to whether a reasonable person would have believed that he was not free to leave).

Here, the initial encounter between the Defendant and Chief Nelson and the other LU officers was consensual. The Chief simply asked Defendant a few questions when he approached the defendant in the LU student cafeteria and asked him for identification. There were no threats or other evidence of coercion or restricted freedom of the Defendant. There is no evidence to suggest that Defendant was required to answer the Chief's questions or provide identification. Mere questioning and request for identification by the police does not, by itself constitute a Fourth Amendment seizure. See I.N.S. v. Delgado, 466 U.S. at 216. Even without a basis to suspect a person, officers may ask to see the person's identification and even request consent to search so long as the officers do not convey a message that the person must comply. United States v. Todd, 963 F.2d 207, 210 (8th Cir. 1992).

The encounter between the Defendant and officers remained consensual up until the point that Defendant stood up and attempted to leave, and was instructed by the Chief and Cpl. Pigford to remain seated. This occurred just after the Chief and officers received the records check information from dispatch which notified them that defendant was not a student at LU, had a criminal history, and was known to be armed. At this point the consensual encounter ended. The instruction to Defendant to remain seated and Defendant's compliance with that instruction, show Defendant was no longer free to leave. Chief Nelson and his officers were at this point, temporarily detaining the Defendant. This detention was not an arrest, but was a Terry stop. That is, Chief Nelson and his officers were temporarily detaining Defendant in order to further investigate his suspicious behaviors (as set forth below) in conjunction with the information they had received from dispatch. A person can be temporarily detained under the authority of Terry when law enforcement has reasonable suspicion that criminal activity may be afoot. Terry v. Ohio, 392 U.S. 1 (1968). Plaintiff's specific argument challenging his detention beyond the point where it was determined he was not a student, is not supported by the evidence or the law. The evidence shows that Chief Nelson and the other officers gathered information during the initial consensual encounter with the Defendant which supported their reasonable suspicion and the temporary detention of the Defendant. See United States v. Black, 525 F.3d 359, 364-66 (4th Cir. 2008) (when a police officer, during a voluntary encounter or otherwise observes unusual conduct which leads him to reasonably conclude in light of his experience that criminal activity may be afoot the officer may temporarily seize or detain the citizen) (citing Terry v. Ohio, 392 U.S. 1 (1968)). This information, as testified to by Chief Nelson and the other officers, included

Defendant's slurred speech, red eyes and odor of alcohol, as well as information provided by the dispatch records check identifying Defendant as individual with a criminal history who was known to be armed. The reasonable suspicion of Chief Nelson and the officers supporting the detention of Defendant was properly based on the information and facts available to them and their commonsense judgments based on the information and facts. See Illinois v. Wardlow, 528 U.S. 119, 125 (2000) (the determination of reasonable suspicion must be based on commonsense judgments and inferences about human behavior). As LUPD officers, the Chief and officers held a duty to protect the safety and welfare of LU students, staff and visitors, and the temporary investigatory detention of Defendant, in order to determine whether he was a danger, was proper under Terry. The law allows officers to make investigatory detentions in order to resolve suspicious behavior. Terry, 392 U.S. at 30. Here, the Chief and officers needed to resolve ambiguities in Defendant's conduct and determine what his basis was for being on the LU campus, in order to dispel their concerns that he was a possible threat to themselves or other persons on campus. See Wardlow, 528 U.S. at 120 (officers can detain an individual to resolve ambiguities in his conduct). As shown by the video of this incident, the Chief and officers detained Defendant only for the period of time necessary to resolve Defendant's suspicious behavior, and this period of time was fairly brief. See Illinois v. Caballes, 543 U.S. 405, 420 (2005) (investigatory intention should last no longer than is necessary to effectuate the purpose of the stop). Accordingly, this Court finds the temporary investigatory detention of Defendant after it was determined he was not a student did not violate Defendant's rights because it clearly fell within the scope of a Terry stop.

The subsequent physical restraint of Defendant as he attempted to flee and subsequent pat down and search of his pockets was also proper under Terry. See Terry, 392 U.S. at 27-31 (officer may temporarily detain a person for purpose of briefly patting down the outer surfaces of his clothing for weapons). Terry provides that a temporary seizure and a pat down of the outside of one's clothing is an exception to the warrant requirement when conducted reasonably. Id. A pat down search for weapons is reasonable where the officer "has reason to believe that he is dealing with an armed and dangerous individual, regardless of whether he has probable cause to arrest the individual for a crime. The officer need not be absolutely certain that the individual is armed; the issue is whether a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger." Terry, 392 U.S. at 27. Here, at the

6

time Defendant attempted to flee, the totality of facts and circumstances made it reasonable for the officers to detain Defendant and conduct a pat down search of his outer clothing, specifically his pants pocket where officers believed that Defendant was concealing a weapon. The totality of facts and circumstances were as follows: Defendant's apparent intoxication; Defendant's lack of purpose for being at the LU student cafeteria; Defendant's criminal history including information that he was known to be armed; information provided by Missouri Department of Probation and Parole advising that Defendant was under supervision with them and had a prior felony conviction for unlawful use of a weapon; a suspicious bulge was seen in Defendant's pants pocket by Officers Nunn and Pigford; Defendant provided an explanatory statement as to the bulge that the Chief Nelson and the other officers knew to be false based on their observations that Defendant's money was in his wallet that he had already removed from his pants; and finally, Defendant's attempt to flee when Chief Nelson stated that the officers were going to check his pockets. Based on these facts and circumstances, Chief Nelson and the officers could not be certain that Defendant was armed, but they clearly had reasonable suspicion to believe that he was armed and dangerous. Any prudent person or law enforcement officer, based on the facts and circumstances as they occurred in this case, would believe it reasonable to temporarily detain Defendant and pat down his pocket, as he attempted to flee, in order to determine if the bulge observed in his pocket was a weapon. Once Officer Pigford patted down Defendant's pocket (or in this instance, felt the outside of Defendant's pocket as the officers struggled to prevent Defendant from fleeing) and confirmed the item in Defendant's pants pocket as a gun, it was proper for Officer Pigford to reach into Defendant's pocket and remove the gun. Id. at 29-31. See also Adams v. Williams, 407 U.S. 143, 145 (1972).

This Court concludes that Defendant's rights were not violated. Defendant's detention, and subsequent pat down and search of his pants pocket which revealed a loaded .40 caliber handgun and the marijuana are supported as proper by Terry v. Ohio, 392 U.S. at 1. There is no basis to support suppression of the handgun and the marijuana found in Defendant's pocket.

**March 24, 2011 Incident**

Defendant argues that the officers had no cause to detain, arrest, or search him in March simply because he walked onto an open public campus, and therefore, any contraband found during the arrest should be suppressed.

7

The Government argues that the verbal no trespass warning previously issued to Defendant by Lt. McKinney on February 24, 2011, provided a proper legal basis for his arrest on March 24, 2011.[3] Defendant was once again on the LU campus, just one month after being issued a no trespass warning, and thus, was in violation of the verbal trespass warning.

The credible testimony given by Officer McKinney at the suppression hearing is that Defendant was issued a verbal no trespass warning when he was arrested on the LU campus on February 24, 2011. Accordingly, when Defendant returned to the campus on March 24, 2011, he was in violation of the verbal no trespass warning and was properly arrested for violation of RSMo. § 569.140, trespass in the first degree. Defendant was properly searched incident to this arrest which resulted in the officers finding a loaded Hi-Point 9mm, semi-automatic pistol on Defendant's person. See United States v. Perdoma, 621 F.3d 745, 750 (8th Cir. 2010) (among the exceptions to the warrant requirement is search incident to arrest). There was no violation of Defendant's rights and there is no basis to support suppression of the pistol found on his person.

## Conclusion

For the reasons set forth above, this Court finds Defendant's motion to suppress is without merit and should be denied. It is therefore,

RECOMMENDED that Defendant Terrence Lamar Hawkins' motion to suppress (doc. 78) be DENIED.

Dated this 7th day of April, 2014, at Jefferson City, Missouri.

/s/ *Matt J. Whitworth*
MATT J. WHITWORTH
United States Magistrate Judge

---

[3] The evidence provided at the suppression hearing shows that the Policies of LUPD provide that a verbal no trespass warning is to be issued in the first instance (consistent with Missouri law) and a formal written trespass warning is to be sought (through the University President) if there is a second incident. LUPD produced their no trespass policy noting the policy's reference to RSMo. § 569.140 which supports that a verbal trespass warning is sufficient (Gov't. Exh. #3), as well as a copy of the letter sent to the LU President seeking the permanent no trespass warning be issued to the Defendant after the second incident. This letter references the verbal warning given to the Defendant on February 24, 2011.